[No. 42844-0-II.   Division Two.   September 4, 2013.]

THE STATE OF WASHINGTON, *Respondent*, v. TAWANA LEA DAVIS, *Appellant*.

*Jordan B. McCabe* (of *McCabe Law Office*), for appellant.

*Russell D. Hauge, Prosecuting Attorney*, and *Randall A. Sutton, Deputy*, for respondent.

¶1 QUINN-BRINTNALL, J. — On September 23, 2011, a jury found Tawana Lea Davis guilty of three counts of unlawful delivery of a controlled substance (methamphetamine) within 1,000 feet of a school bus route stop or perimeter of a school ground, and unlawful use of a building for drug

purposes.[1] Davis appeals, arguing that (1) her counsel was ineffective for failing to challenge the probable cause basis for the search warrant; (2) insufficient evidence supports the delivery of a controlled substance convictions; (3) insufficient evidence supports the school zone enhancements; (4) the trial court violated her right to present a complete defense by limiting certain testimony bearing on the credibility of the State's witnesses; (5) the trial court erred in allowing the presentation of impermissible hearsay evidence; and (6) RCW 69.53.010(1), the statute criminalizing use of a building for drug purposes, is unconstitutional as applied. Davis also argues, in a statement of additional grounds (SAG), that she received ineffective assistance of counsel because trial counsel failed to "object, request a mistrial, or address in any way" that a juror was nodding off during part of the trial; the Bremerton Police Department violated its own manual in handling the confidential informants in this case; and the cumulative error doctrine requires reversal. SAG at 2.

¶2 In the published portion of this opinion, we address Davis's argument that RCW 69.53.010(1) is unconstitutional as applied. Because RCW 69.53.010(1) does not apply to the circumstances alleged in this case, we vacate Davis's conviction for unlawful use of a building for drug purposes and remand for resentencing. The remaining issues are fact specific and are addressed in the unpublished portion of our opinion; because Davis received effective assistance of counsel, probable cause supported issuing the search warrant, sufficient evidence supports her delivery of a controlled substance convictions and school zone enhancements, and the remainder of Davis's arguments lack merit, we affirm Davis's unlawful delivery of a controlled substance convictions along with the school zone enhancements.

---

[1] The jury also found Davis guilty of possession of a controlled substance, two counts of bail jumping, and one count of witness tampering. Davis does not challenge these convictions on appeal.

## FACTS

BACKGROUND

¶3 In November 2010, Bremerton Police Detective Matthew Musselwhite was conducting several methamphetamine-related drug investigations in the city of Bremerton. As part of that effort, Musselwhite "intended on starting an investigation into Tawana Davis's methamphetamine distribution, specifically from the Chieftain Motel," where Davis lived and worked as a maid. 2 Report of Proceedings (RP) at 165-66. Musselwhite had Laura Sutton—a confidential informant (CI) seeking a favorable recommendation from law enforcement on pending drug charges—arrange to purchase drugs from Davis.[2]

¶4 A little before noon on November 16, Detective Musselwhite and Bremerton Police Sergeant Randy Plumb met with Sutton at a secure location not far from the Chieftain. The officers conducted a "thorough search of Ms. Sutton's person, including her vehicle." 2 RP at 170. Although no contraband was found on Sutton, officers did locate "some drug paraphernalia and a small amount of methamphetamine in the car." 2 RP at 170. After briefly interviewing Sutton about these contraband items, the officers determined that Sutton was not "trying to hide anything" and decided to continue with the controlled buy. 2 RP at 172. Musselwhite gave Sutton $80 in prerecorded funds, discussed the plan for the buy, then told Sutton where to meet him and Plumb after "the deal was done." 2 RP at 173. At that point, Sutton left in her own vehicle.

¶5 The officers followed, keeping visual surveillance of Sutton's vehicle the whole time. After Sutton arrived at the Chieftain, Detective Musselwhite "saw her get out of her car and walk in the direction of the . . . hotel office" but then

---

[2] By the time of trial, Sutton appears to have married and is sometimes referred to in the record as "Laura Sutton Husted."

"lost sight of her after she walked towards the rooms." 2 RP at 174. According to Musselwhite, the Chieftain presented "a bit of a surveillance problem" because law enforcement could not come too close to the motel without residents alerting other residents of their presence. 2 RP at 179. Thus, although the officers could maintain visual surveillance of CIs' vehicles from afar, they could not see which motel rooms CIs entered to purchase drugs.

¶6 After about 10 minutes, Sutton reemerged from the hotel and returned to the secure location. At the secure location, Sutton gave Detective Musselwhite "about a gram" of methamphetamine, which she said she purchased from Davis. 2 RP at 180. After discussing the details of the transaction, Musselwhite thoroughly searched Sutton's person while Sergeant Plumb searched her vehicle. Neither search revealed hidden contraband or money. Next, Musselwhite showed Sutton a photomontage he had previously prepared. Sutton immediately selected a photo of Davis as the person she had purchased the drugs from.

¶7 On December 3, 2010, Sutton performed a similar controlled buy with Detective Musselwhite and Sergeant Plumb. During this second controlled buy, she purchased 0.4 grams of methamphetamine from Davis.

¶8 To strengthen his narcotics distribution cases, Detective Musselwhite often used "multiple informants" to purchase drugs from "the same target." 2 RP at 206. Thus, on December 30, 2010, Musselwhite asked another CI familiar with Davis, Robert White, to purchase methamphetamine from her. White was already working as a CI for Musselwhite in a different case, and in that case, "all of his information that was provided . . . was found to be true." 2 RP at 207.

¶9 On the day of this buy, Detective Musselwhite and Bremerton Police Detective Steven Polonsky met White at a secure location, searched his person and vehicle for contraband, and talked about the plan. Musselwhite gave White $130 of prerecorded money to purchase a "teener," or

approximately 1.75 grams of methamphetamine. 2 RP at 210. As with the buys involving Sutton, the detectives lost sight of White shortly after he reached the Chieftain. White left the Chieftain only a few minutes after arriving. As he later told Musselwhite, rather than meeting Davis in her motel room as planned, the deal happened "hand-to-hand through a car window in the parking lot of the motel" because Davis was leaving as White arrived. 2 RP at 213.

¶10 After following White back to the secure location, Detectives Musselwhite and Polonsky searched White's person and vehicle, finding no contraband. White gave Musselwhite a "baggie" of what appeared to be imitation narcotics. The officers confronted White, but he maintained that because the buy happened so quickly (and not in Davis's motel room as expected), he did not realize that the substance was fake. White told Musselwhite that during the next controlled buy, he would confront Davis about the fact that "that stuff was bad." 2 RP at 212.

¶11 The final controlled buy took place on January 14, 2011. Detective Musselwhite and Sergeant Plumb used White as the CI for the buy. At the secure location, neither officer found contraband on White's person or in his car. Musselwhite "planned to use a video recording device on the informant during the course of the buy" because the equipment was available, and after setting up the camera, he gave White $140 in prerecorded funds.[3] 2 RP at 218. As before, Musselwhite observed White leave his vehicle at the Chieftain but lost sight of him before he entered Davis's room. Davis had apparently switched rooms since White was last at the hotel, and accordingly, White "had to go to the front desk and ask them because [he] couldn't find [Davis's] room." 3 RP at 407.

---

[3] Detective Musselwhite discovered, after the buy was complete, that the recording device had malfunctioned. But because the "device had done this before" due to "a wiring insulation problem," Musselwhite was confident that White did not intentionally damage or tamper with the video equipment. 2 RP at 223.

¶12 After about 10 minutes, White returned to his vehicle and left to meet Detective Musselwhite and Sergeant Plumb at the secure location. White gave Musselwhite the baggie "he said he obtained from [Davis] in the motel room in room 102," and Musselwhite "immediately noticed that it was far less methamphetamine in the baggie" than was expected. 2 RP at 220. Plumb searched White's vehicle and, in the backseat, found "pieces of methamphetamine . . . laying openly on the backseat." 2 RP at 220. White denied knowing how the drugs got on the backseat but later admitted to dumping "some in the back for later." 3 RP at 417. White also told Musselwhite that upon Davis insisting that it was "the house rules," he dumped a little of the methamphetamine out on Davis's table for her boyfriend. 3 RP at 415. Because of this, White presumed that unlike the first buy, the methamphetamine was real.

¶13 On January 18, following the CIs' three successful purchases of methamphetamine from Davis, Detective Musselwhite obtained a search warrant for the Chieftain's room 102. After knocking and announcing police presence multiple times, Musselwhite attempted unsuccessfully to open the door with a room key. After that, he "breached the door by kicking it, entered, and contacted Ms. Davis." 2 RP at 233. After reading Davis her *Miranda*[4] rights, Musselwhite had a conversation with her in which she acknowledged her actions in distributing and selling methamphetamine.

¶14 As Detective Musselwhite spoke with Davis, other officers searched her motel room. They found "some drug paraphernalia, some digital scales, packaging materials, unused packaging materials, some used packaging materials that had residue in them that appeared to be methamphetamine residue, [and] some other items that are associated with methamphetamine distribution and usage." 3 RP at 251. Davis admitted that all of the items were hers. After the conversation, Davis "was transported to the Kitsap

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

County Jail and booked for delivery of methamphetamine." 3 RP at 264.

PROCEDURE

¶15 The State charged Davis by information with three counts of unlawful delivery of a controlled substance (methamphetamine) within 1,000 feet of a school bus route stop or perimeter of a school ground, one count of delivery of a substance in lieu of a controlled substance, and one count of unlawful use of a building for drug purposes. RCW 69.50-.401(2)(b), .435(1)(c)-(d), .4012; RCW 69.53.010(1). Davis pleaded not guilty to all of the charges.[5]

¶16 On September 15, 2011, the trial court held a CrR 3.5 hearing. The trial court ruled that Detective Musselwhite appropriately advised Davis of her *Miranda* rights and that Davis's post-*Miranda* statements to Musselwhite were made in a knowing, voluntary, and intelligent fashion. Davis did not request a CrR 3.6 hearing or move to have any of the physical evidence collected from the controlled buys or her motel room excluded from trial.

¶17 Trial began on September 19. Detectives Musselwhite and Polonsky, Sergeant Plumb, Sutton, and White testified as to the events described above. A Washington State Patrol Crime Laboratory forensic scientist testified that both purchases made by Sutton contained methamphetamine, that one of the two purchases made by White contained methamphetamine, and that a number of the items located in Davis's motel room contained methamphetamine. Additionally, the State presented evidence that the Chieftain was within 1,000 feet of a school, the West Sound Technical Skills Center, and a Bremerton School District bus stop.

---

[5] The State also charged Davis with one count of unlawful possession of a controlled substance (methamphetamine) and (later) two counts of bail jumping and one count of witness tampering. RCW 69.50.4013; RCW 9A.76.170; RCW 9A.72.120. The jury convicted Davis of these charges, and as noted earlier, she has not challenged them on appeal.

¶18 On September 23, the jury returned its verdict, finding Davis guilty of three counts of delivering a controlled substance (methamphetamine) within 1,000 feet of a school ground or bus route stop, one count of possession of a controlled substance (methamphetamine), and one count of unlawful use of a building for drug purposes. The jury acquitted Davis of the delivery in lieu of a controlled substance charge.[6] At sentencing, in light of Davis's "extensive criminal history," offender score of 14, and "attempt to influence a witness not to appear," the trial court sentenced Davis to the top of the standard range, 120 months.[7] RP (Nov. 18, 2011) at 14. Davis now appeals.

## DISCUSSION

### USE OF A BUILDING FOR DRUG PURPOSES

¶19 Davis argues that the statute criminalizing use of a building for drug purposes, RCW 69.53.010, is unconstitutionally vague. We disagree with Davis's vagueness challenge. But we conclude that—based on its plain language—the statute is inapplicable to the facts of Davis's case as alleged and we reverse Davis's conviction for unlawful use of a building for drug purposes.

¶20 Our review of the constitutionality of a statute is de novo. *In re Det. of Keeney*, 141 Wn. App. 318, 323, 169

---

[6] Davis challenges the sufficiency of the evidence related to this charge, presented as count III in the second amended information. Although the jury acquitted Davis of this charge, making such a challenge moot, some confusion exists in the trial court's judgment and sentence. Rather than keep the numbering used in the second amended information and jury verdicts, the trial court omitted the delivery in lieu of a controlled substance charge and renumbered the remaining counts (what would have been counts IV through IX) as counts III through VIII. On remand, the trial court should correct the judgment and sentence to alleviate this confusion.

[7] The exact sentence entails Davis serving 96 months, concurrently, on each delivery of a controlled substance conviction plus three 24-month enhancements (for the school zone violations) served concurrently. Davis's other sentences run concurrently to the delivery of a controlled substance sentences. The maximum sentence for delivery of a controlled substance is 120 months, the same as the top end of the standard range in this case. RCW 69.50.401(2)(b).

P.3d 852 (2007). We presume that statutes are constitutional, and a defendant who challenges a statute as unconstitutionally vague must prove vagueness beyond a reasonable doubt. *State v. Watson*, 160 Wn.2d 1, 11, 154 P.3d 909 (2007). For statutes not involving First Amendment rights, we evaluate a vagueness challenge by examining the statute as applied under the particular facts of the case. *Watson*, 160 Wn.2d at 6 (quoting *State v. Coria*, 120 Wn.2d 156, 163, 839 P.2d 890 (1992)); U.S. CONST. amend. I. A statute is void for vagueness if (1) it does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed or (2) it does not provide ascertainable standards of guilt to protect against arbitrary enforcement. *Watson*, 160 Wn.2d at 6 (quoting *State v. Williams*, 144 Wn.2d 197, 203, 26 P.3d 890 (2001)).

¶21 RCW 69.53.010(1) provides,

> It is unlawful for any person who has under his or her management or control any building, room, space, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, to knowingly rent, lease, or make available for use, with or without compensation, the building, room, space, or enclosure for the purpose of unlawfully manufacturing, delivering, selling, storing, or giving away any controlled substance under chapter 69.50 RCW, legend drug under chapter 69.41 RCW, or imitation controlled substance under chapter 69.52 RCW.

¶22 Here, Davis argues that "it is not reasonable to suppose that the Legislature intended to increase the penalty for drug offenses committed in the privacy of a defendant's own room rather than elsewhere." Br. of Appellant at 28. This argument fails to establish either that RCW 69.53.010(1) is insufficiently definite such that ordinary people cannot understand what conduct it proscribes or that the statute provides no ascertainable standards of guilt. *Watson*, 160 Wn.2d at 6. Accordingly, Davis's contention that the statute is unconstitutionally vague on its face lacks merit.

¶23 Nevertheless, our de novo review of the statute establishes that it is inapplicable to the facts of this case. At

trial, the State had to establish that Davis knowingly provided a space under her management or control as "an owner, lessee, agent, employee, or mortgagee" *to others* for storing, manufacturing, selling, or delivering drugs.[8] RCW 69.53.010(1). Although the evidence clearly establishes that Davis worked at the Chieftain and sold drugs from the living quarters on the premises provided as part of her compensation, the record does not establish that Davis managed or controlled any portion of the motel other than the room she herself earned as wages from her position as a maid or that she knowingly made her room available for other people to use, store, or sell drugs.

¶24 Very few Washington cases have addressed the "drug house" statute, but all those that have involve situations where someone who manages or controls a building knowingly allows someone else to use the building to sell, manufacture, or store drugs. *State v. Sigman*, 118 Wn.2d 442, 444, 826 P.2d 144 (1992); *State v. Bryant*, 78 Wn. App. 805, 807, 901 P.2d 1046 (1995) (homeowner knowingly allowed a tenant to grow marijuana in the home); *State v. Roberts*, 80 Wn. App. 342, 356 n.14, 908 P.2d 892 (1996) ("Roberts was not charged with violating either of Washington's 'crack house' statutes. . . . A landlord violates RCW 69.53.010(1) by knowingly acquiescing in such activity by a tenant or subtenant.").

¶25 The plain language of RCW 69.53.010(1) is clear. The legislature intended to punish those managing or controlling property who allowed renters, lessees, etc., to manufacture, sell, store, or deliver drugs from the property with their knowledge. Here, nothing established that Davis acted as a landlord or allowed others to deal drugs from a

---

[8] After oral argument, we requested supplemental briefing on whether RCW 69.53.010(1) requires the State to establish that a defendant knowingly provided a space under her management or control to someone else to store, manufacture, or sell drugs. In its supplemental brief, the State concedes that this is a correct interpretation of the statute.

space of which she maintained control.[9] Accordingly, we vacate Davis's conviction for violation of RCW 69.53.010(1) and remand to the trial court for resentencing.

¶26 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, A.C.J., and FEARING, J., concur.

Reconsideration denied October 4, 2013.

Review denied at 179 Wn.2d 1023 (2014).

---

[9] The State argues that because Davis told Detective Musselwhite at the time of her arrest that she was working with Bernard Lee, her boyfriend, to sell drugs, sufficient evidence existed for the jury to conclude that she violated the statute. Contrary to its argument in supplemental briefing, the State did not argue this in its explanation of the jury instructions during closing argument. *Cf. State v. Holt*, 56 Wn. App. 99, 783 P.2d 87 (1989), *review denied*, 114 Wn.2d 1022 (1990).