**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45764-4-II |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| JOB M. EDWARDS, | |
| Appellant. | |

BJORGEN, A.C.J. — Job Mitchell Edwards appeals his convictions for unlawful imprisonment, felony harassment, possession of a controlled substance with intent to distribute, and unlawful use of a building for drug purposes. He also appeals nine firearm enhancements of which three are attached to each conviction for unlawful imprisonment, felony harassment, and possession of a controlled substance with intent to distribute.

Job argues that (1) the trial court erred when it declined to issue his requested instruction

on self-defense of persons and property, WPIC 17.02,[1] on the unlawful imprisonment charge, (2) there is insufficient evidence to uphold his convictions and firearm enhancements, (3) it was improper for the trial court to allow evidence of his prior acts of selling drugs without conducting an ER 404(b) analysis, (4) the trial court abused its discretion when it found evidence of a gas mask, bullet-resistant vest, and a knife relevant to his charges, and (5) the prosecutor committed prosecutorial misconduct when he made several improper comments during closing argument and rebuttal.

We hold that (1) the trial court erred by declining to instruct on WPIC 17.02 on the unlawful imprisonment charge when substantial evidence in the record supported that self-defense theory, (2) sufficient evidence supports all the remaining convictions and firearm enhancements, (3) the trial court erred by allowing evidence of Job's prior acts of selling, but such error was harmless, (4) the gas mask and bullet-resistant vest were not relevant, but any error in admitting this evidence was harmless, (5) the knife was relevant, and (6) although the prosecutor's comments were improper, a jury instruction would have cured any prejudice, and Job is deemed to have waived any error.

Accordingly, we (1) reverse and vacate Job's conviction of unlawful imprisonment and three firearm enhancements attached to that conviction and (2) affirm Job's remaining convictions and six of the firearm enhancements.

---

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL § 17.02, at 253 (3d ed) (2008) (WPIC).

## FACTS

Job, his brother, Michael Edwards, and his brother's girlfriend, Krystal Freitas, all lived together in a split level house.[2] Michael and Freitas lived upstairs, while Job lived downstairs. All three were involved in a "business" of selling oxycodone. Report of Proceedings (RP) at 156-57. The three would combine their pills, and Michael and Freitas would then sell them to customers.

On October 25, 2012, Freitas and Colton Geeson arranged a deal for Freitas to sell 50 oxycodone pills to Geeson. Before arriving at the house, Geeson informed Freitas that he was bringing "DJ"[3]—a person whom Freitas had never met and who would be buying the pills. Report of Proceedings (RP) at 165, 172-73. Upon DJ and Geeson's arrival, Michael and Freitas had them come inside to the upstairs portion of the home where Michael and Freitas resided.

When Freitas asked for the money, DJ responded that he wanted to see the pills, which Freitas showed him. DJ then pulled his .45 caliber Taurus handgun and put it to Michael's head, demanding the pills. Michael and DJ immediately engaged in a struggle, and Michael screamed for help from Job who was downstairs in his bedroom. Job grabbed his .40 caliber Glock handgun and met DJ on the stairs. As DJ raised his right arm, Job fired several shots into DJ, killing him.

---

[2] We refer to Job and his brother by their first names because they share the same last name. No disrespect is intended.

[3] His true name was Donald Thomas, but throughout the trial he was referred to as "DJ." RP at 323. We continue to use DJ throughout the opinion for consistency with the record and the parties' briefs. No disrespect is intended.

Shortly after the bullets were fired, Michael retrieved his Benelli 12 gauge shotgun from his bedroom and pointed it at Geeson. Michael told Geeson, "I got to kill you now. I'm sorry. I got to." RP at 99. Although the evidence conflicts, some suggests Job was present or heard this threat when it was made.[4] Geeson then stripped off some of his clothing and showed Michael that he was unarmed. Michael then went downstairs. Geeson went outside through a door on the top floor and told an individual next door to call the police. Michael came back upstairs, pointed the shotgun at Geeson, and told him to get back inside. Either Michael or Job then held Geeson at gun point inside the home while Geeson proposed that he would take DJ's body and would never tell the police about the incident.

Agreeing to the proposal, Michael instructed Job to hold Geeson at gunpoint while Michael dragged DJ's body downstairs toward the garage in their home. Then, after retrieving DJ's Taurus handgun from his body, Michael led Geeson outside with the handgun to retrieve DJ's car and pull it into their garage. Job opened the garage for Geeson to pull in the car, pointing his Glock handgun at Geeson and waving him into the garage. After Geeson pulled the car in, the garage door would not close. Geeson then ran away through the garage opening without pursuit by Job or Michael.

Geeson eventually alerted someone, who called the police and reported the incident. Michael called the police as well. Police later found Michael's Benelli shotgun, Job's Glock handgun, DJ's Taurus handgun, and also an SKS assault rifle in Job's bedroom. Police also

---

[4] Geeson testified at trial that Job never threatened to kill him and that Job was not present when the threat was made. Les Bunton, a detective with the Lakewood Police Department, who testified to the content of Job's post-arrest interview, said that Job told him that "Michael was telling Colton that he could not leave, and they were gonna [sic] have to kill him." RP at 324, 328.

found a prescription bottle dated October 22, 2012 containing 30 oxycodone pills with Job's identifying information on it.

The jury found Job guilty of unlawful imprisonment, felony harassment, possession of a controlled substance with the intent to distribute, and unlawful use of a building for drug purposes. The jury also entered verdicts for nine firearm enhancements of which three are attached to each conviction for unlawful imprisonment, felony harassment, and possession of a controlled substance with the intent to distribute. Job appeals, claiming several substantive and procedural errors.

## ANALYSIS

### I. FAILURE TO INSTRUCT ON WPIC 17.02

Job argues that his unlawful imprisonment conviction should be reversed because the trial court erred in denying the instruction he requested based on WPIC 17.02. For the reasons below, we agree that Job was entitled to have WPIC 17.02 submitted to the jury, since substantial evidence in the record supported that self-defense theory.

Job asked the trial court to issue the following instruction based on WPIC 17.02:

> It is a defense to a charge of Unlawful Imprisonment that the force used was lawful as defined in this instruction
> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured or by someone lawfully aiding a person who he reasonably believes is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.
> The use of force upon or toward the person of another is lawful when used in preventing or attempting to prevent a malicious trespass or other malicious interference with real or personal property lawfully in that person's possession, and when the force is not more than is necessary.
> The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of the incident.

The State has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty as to this charge.

Clerk's Papers (CP) at 750.

The trial court denied this instruction stating, "I think I have got an obligation not to confuse them." RP at 481

Because if you look at just the heading of 17.02, it's defense of self, others or property defense, as opposed to 17.03, it's lawful force, detention of a person. So 17.03 really applies to [Geeson] because that's who alleged to be the victim of the kidnapping. And 17.02 is defending self, others or properties which applies to CJ [sic].
So I think that confuses the jury, to give 17.02 as well as 17.03, so that's my inclination, is to give that one.

RP at 481. Later, the court expanded on its reasoning for denying the WPIC 17.02 instruction.

17.02 is the self-defense instruction. And as I indicated, I gave 17.03 plus some of the instructions that go with 17.02 and 17.03.
With regard to that lawful instruction, I am convinced the more I look at that WPIC instruction that that instruction is not applicable to this case and it' s actually, if you read the instruction, that instruction alone, it's kind of a redundant instruction. It really doesn't tell you anything.

RP at 500.

The trial court instead instructed the jury as follows, based on WPIC 17.03:

It is a defense to a charge of . . . Felony Harassment that the force used was lawful as defined in this instruction.
A person who lawfully possesses a building may use force to detain someone who unlawfully enters or remains in the building when:
(1) it is reasonably used for that purpose; and
(2) the manner and duration of such detention is reasonable to investigate the reason for the detained person's presence on the premises; and
(3) the premises in question did not reasonably appear to be open to members of the public; and

(4) the person using the force employs such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

The State bears the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty as to this charge.

CP at 703.

A defendant is entitled to have his or her theory of the case submitted to the jury under appropriate instructions when substantial evidence in the record supports that theory. *State v. Knutz*, 161 Wn. App. 395, 403, 253 P.3d 437 (2011). The State argues that the trial court properly made a determination that the facts applied more closely to self-defense on the shooting (DJ), not on the detaining of a person (Geeson). Therefore, the State contends, Job was still able "to argue his theory of the case, which was that he was not guilty of felony harassment and kidnapping because he was using lawful force to detain [Geeson] as someone who was attempting to rob them." Br. of Resp't at 18. We disagree.

Under these facts, DJ's pulling a gun and attempting to burglarize and possibly kill Michael and Freitas supplied the main theory of self-defense which could justify Job's use of force to keep Geeson in the house (a WPIC 17.02 theory)—not that Geeson had just unlawfully trespassed into the home and Job was detaining him to investigate his presence there (a WPIC 17.03 theory). Job's self-defense theory could have been that he reasonably feared for Michael's, Freitas's, and his own life and that he continued to fear while he had his gun pointed at Geeson throughout the incident. Arguably, after Geeson stripped and showed that he was unarmed, the threat of harm was alleviated and a WPIC 17.02 theory became more remote.

7

However, there was still substantial evidence for a juror to believe that the dangers associated with the immediate aftermath of this armed robbery warranted Job in using the amount of force that he did against Geeson: not to merely detain an intruder, but to use necessary force to protect himself, Michael or Freitas.

Furthermore, after Job's defense counsel offered the WPIC 17.02 instruction, the prosecutor agreed not to object. The prosecutor specifically stated that he did not object to the WPIC 17.02 instruction because he "would feel like an absolute fool if [an appellate court] told us, 'You should have used both instructions.'" RP at 480-81. Despite the prosecutor's insistence, the trial court stated it would still confuse the jury to instruct on both WPIC 17.02 and WPIC 17.03 and denied the instruction. However, we do not believe it was confusing to instruct on both WPIC 17.02 and WPIC 17.03, since each instruction applied to a different self-defense theory arguably supported by the evidence.

Substantial evidence in the record supported a WPIC 17.02 theory of the case, and instructing on both WPIC 17.02 and WPIC 17.03 would not have been unduly confusing. Accordingly, we hold that the trial court abused its discretion in refusing the instruction based on WPIC 17.02.

An error affecting a defendant's self-defense claim is constitutional in nature and requires reversal, unless it is harmless beyond a reasonable doubt. *State v. Arth*, 121 Wn. App. 205, 213, 87 P.3d 1206 (2004). The trial court's refusal to give the requested instruction prevented Job from arguing his theory of self-defense under WPIC 17.02 and was thus not harmless beyond a reasonable doubt. We therefore reverse the unlawful imprisonment conviction and the three firearm enhancements that were attached to that conviction.

## II. SUFFICIENCY OF EVIDENCE

Job argues that there is insufficient evidence to support his remaining convictions and some of the attached firearm enhancements.[5] We disagree.

### 1. Standard of Review

Evidence is sufficient to support a conviction or sentencing enhancement if, viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. McPherson*, 186 Wn. App. 114, 117, 344 P.3d 1283, *review denied*, 183 Wn.2d 1012 (2015); *State v. Hennessey*, 80 Wn. App. 190, 194, 907 P.2d 331 (1995). "A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that a trier of fact can draw from that evidence." *State v. Notaro*, 161 Wn. App. 654, 670, 255 P.3d 774 (2011). "All reasonable inferences from the evidence must be drawn in favor of the verdict and interpreted strongly against the defendant." *Id.* "Circumstantial evidence is no less reliable than direct evidence." *Id.* We must "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

### 2. Felony Harassment

Michael threatened Geeson by pointing a shotgun at him and saying, "I got to kill you now. I'm sorry. I got to." RP at 99. Job then pointed a gun at Geeson throughout the incident. Job argues that there is insufficient evidence to show (1) that he was an accomplice to Michael's harassment of Geeson, (2) that he or Michael acted without lawful authority in threatening

---

[5] Because we reverse the unlawful imprisonment conviction on other grounds, we do not address Job's argument that there was insufficient evidence in the record to uphold that conviction. We also do not address any arguments pertaining to the firearm enhancements attached to the unlawful imprisonment conviction.

Geeson because it was in self-defense, and (3) that his conduct, as the principal, placed Geeson in reasonable fear that the threat would be carried out. We disagree.

a. Accomplice Liability

Job first argues that there was insufficient evidence for a rational juror to conclude that he was an accomplice to Michael's felony harassment of Geeson. The State contends that Job was an accomplice because he assisted Michael in carrying out the threat. We agree with the State.

A person is guilty of felony harassment if, without lawful authority, the person knowingly threatens to kill another person. RCW 9A.46.020(1)(a), (2)(b)(ii). The State must also prove that "[t]he person by words or conduct places the person threatened in reasonable fear that the threat will be carried out." RCW 9A.46.020(1)(b).

Accomplice liability requires knowledge of the crime and that the accomplice: (1) solicits, commands, encourages, or requests another person to commit it, or (2) aids or agrees to aid another person in planning or committing it. RCW 9A.08.020(3)(a). "Presence at the scene of an ongoing crime may be sufficient if a person is 'ready to assist.'" *In re Welfare of Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979) (quoting *State v. Aiken*, 72 Wn.2d 306, 349, 434 P.2d 10 (1967)). Mere presence coupled with knowledge or assent is not sufficient to establish accomplice liability. *Wilson*, 91 Wn.2d at 491; *State v. Everybodytalksabout*, 145 Wn.2d 456, 472, 39 P.3d 294 (2002).

Here, there was sufficient evidence to show that Job assisted Michael in threatening to kill Geeson and placed Geeson in reasonable fear of his life. Job argues that there is no evidence that he was an accomplice to Michael's threat to Geeson, because he was "merely present" in the house and he did not know "Michael was going to threaten to kill Geeson." Br. of Appellant at

10

15-16. However, one of the State's witnesses testified to Job's statements during his post-arrest interview, where Job admitted to hearing Michael's threat to Geeson.

Citing *State v. Robinson*, Job also argues that the felony harassment was "completed before Job could have assisted in any manner." Br. of Appellant at 16; 73 Wn. App. 851, 852, 872 P.2d 43 (1994). In *Robinson*, a passenger in the defendant's car suddenly jumped out, robbed a woman, and returned to the car. 73 Wn. App. at 852. Even though the defendant drove away with knowledge that the passenger had robbed somebody, the court held that the act of robbery was completed by the time he reentered the car and the defendant "could not have aided and abetted [the] crime." 73 Wn. App. at 852-53, 857. Unlike *Robinson*, the crime of felony harassment was not over as soon as Michael uttered the threat to Geeson; rather, a jury could have inferred that Job was assisting in the threat by pointing his gun at Geeson throughout the incident.

Taking the evidence most favorably to the State, Job, here, is more than "ready to assist"—he was actually assisting in carrying out Michael's threat. There was sufficient evidence for a jury to find Job was an accomplice to that threat.

b. Without Lawful Authority[6]

Next, Job argues that there was insufficient evidence for the jury to conclude that the felony harassment was "without lawful authority" because it was in self-defense. Br. of Appellant at 17. Job essentially argues that because he and Michael had lawful authority to use

---

[6] It could be argued that our self-defense analysis that caused Job's unlawful imprisonment to be reversed also could apply to Job's felony harassment charge as well. However, Job failed to propose a WPIC 17.02 instruction for felony harassment below and failed to raise this issue directly in his appellate briefing. Accordingly, we do not reach that issue.

force against DJ, Michael's threat to kill Geeson was also lawful. We disagree.

A jury could reasonably infer that Michael's words "I got to kill you now. I'm sorry. I got to" was beyond self-defense. Further, even though Michael did not repeat the threat upon learning Geeson was unarmed, any juror could reasonably believe that Job's continued pointing of his Glock at Geeson throughout the incident was assisting Michael in carrying out the earlier death threat. There was sufficient evidence for a jury to find Job acted without lawful authority.

c. Reasonable Fear That Threat Will Be Carried Out

Finally, Job argues that because the State failed to put "or as an accomplice" on one of the elements of the felony harassment to-convict instruction, the law of the case doctrine[7] required them to prove that Job's words or conduct, as the principal, placed Geeson in reasonable fear that the threat would be carried out.[8] Assuming without deciding that this argument is correct, we hold that the evidence that Job pointed a gun at Geeson throughout the incident after Michael said he had to kill Geeson is sufficient to show that Job's conduct, as the principal, placed Geeson in reasonable fear that Michael's threat would be carried out.

---

[7] Under the law of the case doctrine, jury instructions not objected to become the law of the case. *State v. Hickman*, 135 Wn.2d 97, 101-02, 954 P.2d 900 (1998).

[8] To convict the defendant
  of the crime of Felony Harassment as charged in Count Five, each of the following elements of the crime must be proved beyond a reasonable doubt:
    (1) That on or about the 25th day of October, 2012, *the defendant or his accomplice* knowingly threatened to kill Colton Geeson immediately or in the future;
    (2) That the words or conduct of *the defendant* placed Colton Geeson in reasonable fear that the threat to kill would be carried out.
CP at 708 (emphasis added).

12

3.      Possession with Intent to Deliver a Controlled Substance

Job next argues that there was insufficient evidence to uphold his conviction of possession with intent to deliver a controlled substance based on accomplice liability. We disagree.

Possession with intent to deliver a controlled substance required the State to prove that, on or about October 25, 2012, Job or an accomplice possessed a controlled substance and that he or an accomplice intended to deliver it. RCW 69.50.401. Contrary to Job's contention, the State did not need to prove that Job supplied the *exact* pills that were to be delivered to DJ and Geeson or that he had the intent of selling *specifically* to them. Rather, the State only needed to show that Job was an *accomplice* to Michael's and Frietas's possession of the substance and their intent to distribute to DJ and Geeson.

The evidence showed that Job contributed oxycodone pills to a common pile from which Michael and Freitas would take drugs to deliver and sell. This evidence demonstrates a shared possession of the drugs and a shared intent to deliver to Michael's and Freitas's drug customers. The pill bottle found with 30 oxycodone pills in it, prescribed only three days earlier to Job, further provides evidence that he was continuing to be an accomplice in Michael's and Frietas's possession and intent to deliver to drug customers, including DJ and Geeson. Accordingly, we hold there is sufficient evidence to support Job's conviction of possession with intent to deliver a controlled substance.

4.      Unlawful Use of a Building for Drug Purposes

Job argues there was insufficient evidence to establish that the upstairs was under his control to convict him of unlawful use of a building for drug purposes. We disagree.

In order to convict Job of unlawful use of a building for drug purposes, the State must have proved that he knowingly made available for use a space under his management or control as a lessee to others for storing, manufacturing, selling, or delivering drugs. RCW 69.53.010(1); *State v. Davis*, 176 Wn. App. 385, 394-95, 308 P.3d 807 (2013), *review denied*, 179 Wn.2d 1023 (2014). Both parties rely on *Davis* in taking their respective positions. In *Davis*, the defendant was found guilty of unlawful use of a building for drug purposes based on her selling drugs out of her motel room. *Id.* at 388-93. However, we reversed, holding that the record failed to establish that the defendant managed or controlled any other portion of the motel or that she knowingly made her room available for other people to sell drugs: "nothing established that Davis acted as a landlord or, herself, allowed others to deal drugs from a space of which she maintained control." *Id.* at 395-96.

Here, while Job primarily lived downstairs, and Michael upstairs, there was sufficient evidence to show that Job had the upstairs "under control" for purposes of the statute. As argued by the State, Job and Michael were lessees together on the residence in question. In addition, the only kitchen, which Job shared with Michael, was upstairs. Unlike *Davis*, where the defendant lived alone in a hotel room dealing drugs, there is sufficient evidence here to show that Job knew[9] of the drug activities and had access to the space. Perhaps if this were a situation where Michael had locked the upstairs area with a key that Job had no access to, Job could not be said

---

[9] Job also argued even if it can be shown that the upstairs was under his control, there is no evidence that shows he knowingly made the upstairs available for that use. Knowingly "mak[ing] available for use" a space under the defendant's control for illegal drug purposes means *allowing* a person to carry out said activities. *See State v. Sigman*, 118 Wn.2d 442, 447, 826 P.2d 144 (1992), (landlord who knew of tenant's drug activities and allowed it to continue for several months knowingly "made available for use" his property). The record demonstrates that, at the very least, Job allowed the upstairs to be used for illegal drug activities. We find this is sufficient evidence to support the knowledge element.

to have control for purposes of the statute. However, that is not the case here when viewing the evidence in the light most favorable to the State. *State v. Sigman*, 118 Wn.2d 442, 445, 826 P.2d 144 (1992).[10]

We hold there was sufficient evidence to establish that Job had sufficient control over the upstairs area to allow a reasonable juror to find him guilty of unlawful use of a building for drug purposes.

5.      Firearm Enhancements

Job argues that there is insufficient evidence to support three of his firearm enhancements on his possession with intent to deliver a controlled substance conviction and two firearm enhancements on his felony harassment conviction. We disagree.

a.  Legal Principles

A person can be subject to a sentencing enhancement if "armed with a firearm" while committing a crime. RCW 9.94A.533(3).[11] A person is "armed with a firearm" if the person could both (1) easily access and readily use a weapon and (2) a nexus connects the person, the weapon, and the crime. *State v. Eckenrode*, 159 Wn.2d 488, 490-91, 150 P.3d 1116 (2007).

A person can easily access and readily use a weapon when it is easy to get to for use against another person, whether for offensive or defensive purposes, to facilitate the commission

_____

[10] Job also argues that if the court upholds his conviction that this statute will "criminalize[] the mere act of knowingly having a housemate who sells drugs." Reply Br. of Appellant at 10. So long as the defendant also had shared control of the area where the roommate had the drugs, we agree that is correct. The legislature has indicated that a person should call police in situations where their roommates are facilitating drug crimes, since this is a defense to unlawful use of a building for drug purposes. RCW 69.53.010(2) ("It shall be a defense [to] . . . notify a law enforcement agency of suspected drug activity.").

[11] RCW 9.94A.533 was amended in 2012, 2013 and 2015. These amendments do not affect the issues in this matter.

of the crime or to protect contraband. *State v. Neff*, 163 Wn.2d 453, 462, 181 P.3d 819 (2008) (plurality opinion); *State v. Gurske*, 155 Wn.2d 134, 139, 118 P.3d 333 (2005). The defendant does not have to be armed at the moment of arrest to be armed for purposes of the firearms enhancement. *State v. O'Neal*, 159 Wn.2d 500, 504, 150 P.3d 1121 (2007); *but see State v. Valdobinos*, 122 Wn.2d 270, 283-84, 858 P.2d 199 (1993).

Second, to be deemed armed while committing a crime, there must be a nexus connecting the person, the weapon, and the crime. *Neff*, 163 Wn.2d at 462 (plurality opinion). Mere possession or ownership of a weapon does not establish a sufficient nexus. *State v. Brown*, 162 Wn.2d 422, 432, 173 P.3d 245 (2007).

In every case, whether a defendant is armed is a fact-specific decision. *Gurske*, 155 Wn.2d at 139 ("Regardless of the offense, whether the defendant is armed at the time a crime is committed cannot be answered in the same way in every case.").

b. Possession with Intent to Deliver

Job argues that his three firearm enhancements based on (1) the Glock handgun, (2) the SKS assault rifle found in his bedroom, and (3) the Benelli shotgun, attached to his possession with intent to deliver conviction, should be vacated for insufficient evidence. The State contends that sufficient evidence supports that Job or an accomplice was "armed" with all three firearms. Br. of Resp't at 14-15. The State is correct.

There is no question that Job or Michael could easily access and readily use these weapons. The Glock and SKS assault rifle were found in Job's room, and Michael's shotgun was located in his room. Job's role as an accomplice connects him to Michael, the principal, which makes the shotgun enhancement permissible on his conviction. *O'Neal*, 159 Wn.2d at 506 (holding that there was sufficient evidence to uphold the defendant's firearm enhancement

16

because there was evidence that the gun in question was at least readily accessible to the accomplice).

As to the nexus requirement, Job's and Michael's use of the weapons was a "defensive use" to "protect contraband," i.e., to ensure that the drug deliveries were successful. *Gurske*, 155 Wn.2d at 139. As in *O'Neal*, where one of the accomplices testified that they were using weapons to protect their operation, 159 Wn.2d at 505-06, Freitas testified at trial that the guns Michael and Job possessed were used to protect them from being robbed. Unlike *Brown*, 162 Wn.2d at 425-26, 432, this is not a case where Job merely picked up a gun that did not belong to him and put it back down. Rather, the evidence supports that he was an accomplice in the delivery of the drugs to Geeson and DJ and that when they interfered with that transaction, Job was ready to assist Michael with his Glock or SKS in his room. Furthermore, the jury could have inferred that Michael's attempt to grab the shotgun before DJ burglarized them was an attempt to protect the drugs from being stolen.

Accordingly, we hold that there is sufficient evidence to support all three firearm enhancements; that is, all weapons were accessible either to Job or Michael and a nexus existed between them, the weapons, and the crime, namely to protect the drugs from being stolen.

c. Felony Harassment

Next, Job argues that there is insufficient evidence to support two of the three firearm enhancements on the felony harassment conviction: those involving (1) the Glock handgun and (2) DJ's Taurus handgun. We disagree.

The Glock can be easily seen to be facilitating the felony harassment. As argued above, there was evidence that Job at least heard Michael make the threat to Geeson and then continued to point his Glock at Geeson throughout the incident. However, it is more difficult to conclude

17

the same as to the Taurus handgun. Job argues that the threat was over when Michael picked up DJ's Taurus handgun, making it unconnected to the felony harassment charge. But when taking the facts in the light most favorable to the State, a reasonable juror could have found that Michael's picking up DJ's gun helped facilitate the felony harassment. In effect, it could be seen as taking away Geeson's only means of defending himself, further putting him in fear of his life. Moreover, there is evidence that Michael used the Taurus to force Geeson to get into DJ's car and drive it into the garage.[12] As stated above, the jury could have believed that Job assisted Michael in the felony harassment as an accomplice, and therefore, the firearm enhancement based on the Taurus handgun is not improper. Accordingly, we uphold the firearm enhancements attached to the felony harassment conviction.

### III. ER 404(B) PRIOR ACTS

Job argues that Freitas's testimony about Job's previous drug transactions was propensity evidence that should have warranted an ER 404(b) analysis. We agree with Job that the trial court should have conducted an ER 404(b) analysis, but hold that any error in admitting the evidence was harmless.

---

[12] Job also argues that this court should consider *Rosemond v. United States*, 134 S. Ct. 1240, 188 L. Ed. 2d 248 (2014), *petition for cert. filed*, No. 15-585 (Nov. 3, 2015), where under "analogous" federal law, 18 U.S.C. § 924(c), the United States Supreme Court "held that the government must prove that the defendant knew in advance that a confederate will carry a gun before suffering the enhanced penalty." Br. of Appellant at 49. There are two reasons we find this not persuasive. First, the federal law is different than Washington law regarding accomplice liability and firearm enhancements. *Compare* 18 U.S.C. §§ 2, 924 *with* RCW 9A.08.020; RCW 9.94A.533. Second, even if we did adopt a knowledge requirement to find accomplices guilty of a firearm enhancement, there is evidence here that Job did have knowledge that a firearm would be involved in facilitating the felony harassment through the Glock and shotgun. In *Rosemond*, the defendant believed that *no* gun would be used in facilitating the crime—not that *another* gun would not be used. *See* 134 S. Ct. at 1245-46, 1251.

ER 404(b) disallows evidence of prior acts "to prove the character of a person in order to show action in conformity therewith." The first question is whether any of the evidence that tended to show Job was an accomplice with the intent to deliver a controlled substance qualified as a "prior act" for ER 404(b). We find that some of the evidence does qualify. Freitas properly testified about the operation between Michael, herself, and Job: that all three acquired pills, grouped them into a pile, and she and Michael would sell the pills. That was how the operation ran when they sold to Geeson and thus would be proper nonpropensity evidence.

However, the trial court allowed the prosecutor to inquire into Job's prior sales of drugs:

| [Prosecutor]: | Roughly, how many customers did Job have? |
|---|---|
| [Freitas]: | Pretty much his brother, Michael. |
| [Prosecutor]: | Anyone else besides that? |
| [Freitas]: | Not really. He had a few that he would deal with that were friends. |
| [Prosecutor]: | Even up to the time of the incident? |
| [Freitas]: | It had pretty much subsided him selling any to anybody. |
| [Prosecutor]: | Okay. How long had it been since he had people that he had sold to? |
| [Freitas]: | Probably a year. |
| [Prosecutor]: | Okay. So up until a year before the incident, Job was-- part of his participation was to actually sell pills, until about a year before, his customers run out? |
| [Freitas]: | It's a tricky question, but Michael had taken over his brother's customers, so what they weren't doing or selling to I was the one selling them to. |
| [Prosecutor]: | Job's customers switched over to Michael? |
| [Freitas]: | Yes. |

RP at 158. This inquiry into Job's prior involvement in selling pills directly to customers is prior act evidence under ER 404(b).

When ER 404(b) is triggered, the trial court is required to carry out a four-part test on the record and determine whether the prior act evidence is admissible. *State v. Gunderson*, 181 Wn.2d 916, 923, 337 P.3d 1090 (2014). We may conduct our own ER 404(b) analysis, if from the record we can properly decide the issue of admissibility. *State v. Gogolin*, 45 Wn. App. 640,

645, 727 P.2d 683 (1986). However, we decline to conduct our own ER 404(b) analysis because any error in admitting the evidence was harmless.

In analyzing the erroneous admission of evidence in violation of ER 404(b), we apply the nonconstitutional harmless error standard. *State v. Gower*, 179 Wn.2d 851, 854, 321 P.3d 1178 (2014). This requires us to decide whether within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected. *Id.* Job's prior sale of drugs was a very small part of the evidence of the drug operation which he, Freitas, and Michael were all a part of. Freitas's one or two responses that implicated Job as having sold drugs in the past cannot be said to have materially affected the trial's outcome within reasonable probabilities. We hold that any erroneous admission of this evidence was harmless error.

## IV. RELEVANCE

Job argues that evidence of a gas mask, bullet-resistant vest, and a knife were irrelevant and prejudicial. We agree with him as to the gas mask and bullet-resistant vest, but hold that any error in admitting that evidence was harmless.

"Evidence which is not relevant is not admissible." ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "The threshold to admit relevant evidence is very low. Even minimally relevant evidence is admissible." *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). "Evidence is relevant if a logical nexus exists between the evidence and the fact to be established.'" *State v. Briejer*, 172 Wn. App. 209, 225-26, 289 P.3d 698 (2012) (quoting *State v. Burkins*, 94 Wn. App. 677, 692, 973 P.2d 15 (1999)). Questions of relevancy "are within the discretion of the trial court,

20

and [this court] review[s] them only for manifest abuse of discretion." *State v. Aguirre*, 168 Wn.2d 350, 361, 229 P.3d 669 (2010).

Job argues that the knife, gas mask, and bullet-resistant vest have no logical, relevant tendency to show that he committed any of the charges against him. We disagree as to the knife, since it was at least minimally relevant in establishing that he used weapons to protect their drug operation. The vest, however, is irrelevant, in part because it has no connection to Job directly and does not relate to any of the charges. In fact, as Job points out, the vest was found in Michael's room, not his. Even if it had been found in Job's possession, the vest had no tendency to make any of his charges more probable than would be the case without that evidence. Similarly, the gas mask is not relevant to the charges. Perhaps if the State's theory had been that Job, Michael, or Freitas had been involved in the manufacture of drugs then it would be relevant; however, like the bullet-resistant vest, there is no logical nexus between the gas mask and Job's charges.

Even though we find that the gas mask and bullet-resistant vest were irrelevant, we hold that any error in admitting this evidence was harmless. "'An evidentiary error [that] is not of constitutional magnitude . . . requires reversal only if the error, within reasonable probability, materially affected the outcome.'" *Briejer*, 172 Wn. App. at 228 (alteration in original) (quoting *Everybodytalksabout*, 145 Wn.2d at 468-69). Conversely, "'[t]he error is harmless if the evidence is of minor significance compared to the overall evidence as a whole.'" *Briejer*, 172 Wn. App. at 228 (alteration in original) (quoting *Everybodytalksabout*, 145 Wn.2d at 469). The bullet-resistant vest was merely shown in a picture, identified in court, and submitted to the jury. Similarly, the gas mask was simply shown to the jury both in picture form and in person. Compared to the extent of evidence presented by Freitas and Bunton to demonstrate Job's

participation and knowledge of the drug operation with Michael and Freitas, these small pieces

of evidence were of minor significance compared to the overall evidence as a whole in Job's

convictions.  We hold that any error in admitting this evidence was harmless.

## V.  PROSECUTORIAL MISCONDUCT

Job argues that in the State's closing argument the prosecutor committed misconduct in

three ways:

> by (1) comparing the case to "Pulp Fiction," a popular fictional movie depicting
> graphic violence and drug use; (2) arguing that Job's home was an armed camp and
> that Job was prepared to combat law enforcement; and (3) arguing that Job's
> shooting of DJ . . . was not necessarily justified and that Job's motive in shooting
> DJ was not protection of himself and his housemates.

Reply Br. of Appellant at 18.  The State contends that these comments were not misconduct, and

that even if they were, Job fails to meet his burden in showing prejudice.  We agree with Job that

these comments, especially in the aggregate, were improper.  However, we hold that even under

the cumulative error doctrine Job waived any error, since a jury instruction could have cured the

resulting prejudice.  Accordingly, his prosecutorial misconduct claim fails.

1.    Legal Principles

To establish prosecutorial misconduct, the defendant must prove that the prosecuting

attorney's remarks were both improper and prejudicial.  *State v. Allen*, 182 Wn.2d 364, 373, 341

P.3d 268 (2015).  "In analyzing prejudice, we do not look at the comments in isolation, but in the

context of the total argument, the issues in the case, the evidence, and the instructions given to

the jury."  *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).  To show prejudice the

defendant must "show a substantial likelihood that the misconduct affected the jury verdict."  *In*

*re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012), *cert. denied*, 136 S.

Ct. 357 (2015).

Job did not object at trial to any of conduct he now characterizes as improper and prejudicial. When a defendant fails to object to the challenged portions of the prosecutor's argument, he or she is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). Therefore, to prevail on a prosecutorial misconduct claim for conduct to which he did not object below, Job must show that (1) no curative instruction would have eliminated the prejudicial effect and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Id.* at 761.

2.       Impropriety

a.  Pulp Fiction Comments

During closing argument, the prosecutor introduced the case, saying,

Thank you for your time and your service on behalf of myself and Mr. Kawamura, I am sure.
       Hopefully what we gave you was a pretty interesting case. If you've sat on 10, 20 or 30 juries, I am gonna [sic] bet you never saw a case like this one before and you never will again. *I liken it to the movie Pulp Fiction. It's that crazy. It's that insane.* None of it really seems to make any sense from the average citizen's point of view, but there it is. And it isn't just a movie, it happened.

RP at 505 (emphasis added). Job did not object.

Job argues that the prosecutor's personal opinion that the case was "crazy," "insane," and resembled a violent movie was an appeal to the jury's passion and prejudice. Br. of Appellant at 39. The State argues that the prosecutor was "merely illustrating for the jury that this case is outside of most people's common frame of reference." Br. of Resp't at 26. Taking these comments in isolation, we agree with the State; that in the context of this case it supplied a way

23

for the jury to understand the case. However, these comments become improper when taken in context with the other portions of the prosecutor's closing argument and rebuttal analyzed below.

b. Armed Camp Comments

After discussing the physical evidence admitted at trial, the prosecutor stated during closing argument:

> And what does all that physical evidence tell you? Well, one primary thing is, these guys are living in an *armed camp*. . . . And they have got what in there? *An assault rifle with over a thousand rounds of ammo with vest - penetrating ammunition. What is the point of that? Is that to go after a drug rip customer? Probably not. Because who wears vests? Not drug rip customers.*
> They have got a gas mask with canisters. What is the point of that? *Is a drug customer gonna* [sic] *be coming there to try to break into the house by throwing in tear gas? Not likely, but who might? Who would use tear gas to flush those guys out of that house?*
> You've got a bulletproof vest. I mean, you've got—it's an *armed camp*. That's what it is. They are loaded for bear, and *whatever trouble comes their way, they are gonna* [sic] *be prepared to fight to the death.*

RP at 520-21 (emphasis added). Job did not object.

Job argues that the prosecutor "emphasize[d] the presence of lawfully possessed weapons and items, insinuating that their purpose was to combat law enforcement, rather than for protection." Br. of Appellant at 39. We agree.

The State is correct that it was proper to argue that Job and Michael were prepared to stop people from robbing them of their drugs. However, the State's further contention that Job and Michael were prepared to fight more than robbers was improper. While the prosecutor never said so directly, he insinuated that Job was preparing to fight police officers in three ways, through the penetration ammo, gas mask, and bullet-resistant vest.

Although there was evidence presented to the jury at trial that Job had weapons to protect the drugs, there was no relevant crime that made it proper for the prosecutor to argue that Job was ready to battle law enforcement. This argument was both outside the evidence and

24

inflammatory to the jury. *See State v. Belgarde*, 110 Wn.2d 504, 506-08, 755 P.2d 174 (1988).

As such, it was improper.

    c. Killing DJ Comments

Immediately after the "armed camp" statements discussed above, the prosecutor made

comments related to the justifiability of killing DJ,

> And when that time came, they sprang into action, and *DJ was a goner.* I mean, there was no question about what was going to happen to DJ. *DJ was not gonna* [sic] *come out of that house alive* and he didn't. And he wasn't hit by just one gun. He was hit by both. And the odds are probably pretty good when you sit down to figure out the facts of how things went; that *DJ was almost certainly dead by the time he hit the ground.*
>
>     And when you think about the fact of how things played out, Michael didn't have enough time to get that shotgun and come back and hit DJ before DJ hit the ground. *That shotgun blast was probably while DJ was laying there on the ground.* So to some extent, it's somewhat gratuitous, but it shows you the mindset of the partners in this organization and what they were going to do and when they had to do it. They didn't have to stop and talk about it. They just acted.

RP at 521 (emphasis added). Job did not object.

In the defense's closing argument, counsel characterized Job's shooting of DJ as

"justified because you don't see him charged with the death of DJ." RP at 535. In rebuttal, the

State argued,

>     *DJ's shooting, killing has been found to be justified. You didn't hear that from anybody in this case. Nobody ever once said that except Mr. Kawamura.* We are not here to decide a murder case. That issue is off the table. Job didn't do anything to assist. *Well, if you call killing somebody not doing anything*, okay. But what was he doing when he killed DJ? What was he protecting?
>     Yes, he might have been protecting his brother, but at the same time, he is protecting his drug-dealing partner, both of his drug-dealing partners, and he is protecting the access of his drug organization. *So don't say he did nothing. He did something.* He did something really significant that day. He may have had a dual purpose in doing so, but he did something, something drastic and *somebody died as a result.* I am not gonna [sic] say DJ didn't deserve it. That's a whole different issue for a whole different day if that day ever comes, but he did something that day.

RP at 549-50 (emphasis added). Job did not object.

The State first argues that the prosecutor was simply rebutting defense counsel's argument that the shooting of DJ was justified. However, as Job points out, the State originally brought up the justification of shooting DJ in its closing argument; the State was not merely rebutting defense counsel's arguments.

In its initial closing, the State put special emphasis on the killing of DJ, referring to him "as a goner" and saying, "There was no question about what was going to happen to DJ . . . [he was] almost certainly dead by the time [he] hit the ground." RP at 521. The rebuttal contained similarly improper comments; for example, the prosecutor properly said that "we are not here to decide a murder case" but then seemingly contradicted his own argument by stating, "Job didn't do anything to assist. Well, if you call *killing somebody* not doing anything, okay." RP at 549-50. This comment could have allowed the jury to infer Job's guilt on unrelated and uncharged crimes because of his killing of DJ.[13] We hold that these comments were improper.

3.    Curative Instruction/Cumulative Error

Although we hold that the prosecutor's comments discussed above, especially in the aggregate, were improper, we also hold that the misconduct involved was not so flagrant and ill-intentioned that a jury instruction would not have cured the prejudice. Therefore, Job is deemed to have waived any error.

"[A] defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766. "'[T]he cumulative effect of repetitive

---

[13] Moreover, comments at the end of a prosecutor's rebuttal closing are more likely to cause prejudice. *See State v. Lindsay*, 180 Wn.2d 423, 443, 326 P.3d 125 (2014).

prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect.'" *Glasmann*, 175 Wn.2d at 707 (quoting *State v. Walker*, 164 Wn. Ap. 724, 737, 265 P.3d 191 (2011)). "Cumulative error may call for reversal, even if each error standing alone would be considered harmless." *State v. Thorgerson*, 172 Wn.2d 438, 454, 258 P.3d 43 (2011). The nature and the degree of prejudice that results from the improper comments determine whether a curative instruction would have removed the prejudice. *Belgarde*, 110 Wn.2d at 507-10; *see also State v. Rafay*, 168 Wn. App. 734, 829-32, 285 P.3d 83 (2012).

Here, the prosecutor's reference to the case being as "crazy" and "insane" as Pulp Fiction, the implication that Job was prepared to kill police officers, and the repeated references to how DJ was killed, were improper. However, any prejudice flowing from these comments would have been curable if he had objected. The comments did not rise to the level of incurability present in *Belgarde*, where the prosecutor directly told the jury to consider the prejudicial comments in the jury room. 110 Wn.2d at 508-10. Nor do we find them as egregious as *Rafay*, where the court found no substantial likelihood that a comparison to the beheading of an American citizen that was extensively covered in the news affected the outcome of the trial. 168 Wn. App. at 829-32.

The prosecutor's comments, taken in the aggregate, were curable. Thus, Job waived any claim of error to them by failing to object. Accordingly, his prosecutorial misconduct claim fails.

CONCLUSION

We reverse and vacate Job's conviction of unlawful imprisonment and the three firearm enhancements attached to that conviction. We affirm the rest of his convictions and firearm enhancements.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, A.C.J.

We concur:

MAXA, J.

MELNICK, J.